COPY

RECEIVED
JAN 20 2006
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X

JOSE SEMORILE, JR.,

                              Plaintiff,

       -against-                                    **SECOND**
                                                    **AMENDED**
                                                    **COMPLAINT**
CITY OF NEW YORK, DAVID TWEEDY,                     **AND JURY**
individually and in his official                    **DEMAND**
capacity as Acting Commissioner of
the NYC DEP, EDWARD WELCH, individually and
in his official capacity as Chief of the            05 Civ. 7261(LAK)
NYC DEP Police Department, and FRANK MILAZZO,
individually and in his official capacity
as Captain of the NYC DEP Police Department.

                              Defendants.
------------------------------------------X

       Plaintiff, JOSE SEMORILE, JR., by his attorneys,

CRONIN & BYCZEK, LLP, as and for his Second Amended

Complaint against Defendants, CITY OF NEW YORK, DAVID

TWEEDY, EDWARD WELCH, and FRANK MILAZZO, respectfully

alleges as follows:

                        **NATURE OF ACTION**

       1.   This is a proceeding for damages to redress the

deprivation of rights secured to Plaintiff under the First

Amendment to the Constitution of the United States of

America.

       2.   Plaintiff brings this action to recover damages

for plaintiff's unlawful discharge by defendant, CITY OF

NEW YORK, plaintiff's employer, in retaliation for

Plaintiff's exercise of his rights secured by the First Amendment to the United States Constitution, and for reinstatement by defendant, CITY OF NEW YORK, to plaintiff's position of employment.

### JURISDICTION AND VENUE

3.   Jurisdiction is conferred on this court pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 1343(3) and (4), 2201 and 2202.

4.   Venue is invoked pursuant to 28 U.S.C. §1391 as plaintiff resides in Bronx County within the State of New York, and that the unlawful practices alleged below were committed in Bronx and Westchester Counties within the State of New York.  Accordingly, venue lies in the United States District Court for the Southern District of New York.

### THE PARTIES

5.   That plaintiff, JOSE SEMORILE, JR., at all times relevant, was an employee of the City of New York Department of Environmental Protection Police. As such, plaintiff was also a member of defendant, SERVICE EMPLOYEE INTERNATIONAL UNION LOCAL 300 AFL-CIO.

6.   That at all times hereinafter mentioned, and at the time of the commencement of this action, plaintiff was and still is a resident of the County of the Bronx, State

of New York.

7.     That defendant, CITY OF NEW YORK, ("CITY") is a municipal corporation duly organized under the laws of the City and State of New York, and having its place of business within the City of New York, and the employer and the governmental entity responsible for the New York City Department of Environmental Protection and the Police Officers employed therein.

8.     Defendant, DAVID TWEEDY, ("TWEEDY"), at all time relevant, was the Acting Commissioner of the DEP Police Department, and as Acting Commissioner, was the principal administrator responsible for the for the overall policies of the Department of Environmental Protection Police Department, including the institution and application of all departmental rules, regulations, disciplinary proceedings and conduct of investigations during all relevant times to this complaint. Defendant, TWEEDY, is sued in his individual and official capacities.

9.     Defendant TWEEDY at all times relevant herein, was responsible for the conduct of all police personnel operating under his command, including all other defendants, and is responsible for assuring that all officers comport themselves consistently with the Constitution of the United States and all state, federal

and local laws.

10.   Defendant, EDWARD WELCH, ("WELCH"), is a Chief
with the NYC DEP Police Department, was one of plaintiff's
superior officers during the relevant time period, and is
sued in his individual and official capacities.

11.   Upon information and belief, defendant "WELCH"
was and is a resident of the State of New York and at all
times relevant acted under color of law, within the scope
of his official duties as a Chief and pursuant to statutes,
ordinances and laws of NYC, New York State and the United
States.

12.   Defendant, FRANK MILAZZO, ("MILAZZO") is a
Captain with the New York City Department of Environmental
Police Department, was plaintiff's superior officer during
the relevant time period, and is sued in his individual and
official capacities.

13.   Upon information and belief, defendant MILAZZO
was and is a resident of the State of New York and during
the incidents alleged herein, and at all times relevant
acted under color of law, within the scope of his official
duties as a Captain and pursuant to statutes, ordinances
and laws of NYC, New York State and the United States.

**FACTUAL BACKGROUND**

14.   Plaintiff, JOSE SEMORILE, JR., began his

employment with the New York City Department of
Environmental Protection (hereinafter "DEP") as a Police
Officer in December 2001, and was continuously employed
until his unlawful termination by defendants in July 2005.
The Department of Environmental Protection is an agency of
the City of New York.

15. SERVICE EMPLOYEE INTERNATIONAL UNION LOCAL
300 AFL-CIO, ("SEIU"), is the union organization that
represents the City of New York Department of Environmental
Protection Police, with its principal place of business and
headquarters located at 180 Broadway, Suite 800, New York,
New York 10038-2506.

16. SEIU was the recognized collective bargaining
representative of the bargaining unit consisting of
employees of defendant CITY OF NEW YORK, including
plaintiff, employed by the NYC Department of Environmental
Protection, an agency of the CITY OF NEW YORK.

17. In 2004, plaintiff was promoted to the rank of
Detective and was selected to serve as a member of the
Joint Terrorist Task Force of the NYPD, an elite taskforce
organized in connection with the U.S. Department of
Homeland Security. Plaintiff is also a drilling reservist
in the United States Naval Reserve since enlisting in June
2002, and was recently promoted to Sergeant.

18. As an employee of the DEP Police Department, plaintiff was a member of SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 300 (hereinafter "SEIU"), during the course of his tenure with the DEP.

19. On July 17, 2001, defendant CITY and SEIU, entered into a Memorandum of Economic Agreement covering employees, including plaintiff, in the above-mentioned bargaining unit. The terms of the Memorandum of Economic Agreement were incorporated into the successor collective bargaining agreement. The agreement was entered into by defendant CITY and SEIU for the benefit of the employees in the bargaining unit, and plaintiff, as a member of said bargaining unit, is accordingly entitled to the benefit of the agreement and to enforce the provisions of the agreement. At the time of the occurrences which are the subject matter of this action, all parties were acting in accordance under the terms and provisions of the collective bargaining agreement.

20. Defendant CITY has breached its duties and obligations as set forth in the Collective Bargaining Agreement and Memorandum of Economic Agreement, as well as its implied covenant of fair dealing and its statutory duties under Section 75 of the Civil Service Law.

21. Defendants conspired with SEIU to terminate

plaintiff's employment although there was no just cause and the negotiations between defendant CITY and SEIU with respect to plaintiff's disciplinary grievance were spurious and carried on in bad faith. Said acts were committed by defendants in retaliation for plaintiff's declared support of a decertification movement of the DEP Police Department from SEIU, as outlined below.

22. In June 2003, plaintiff SEMORILE, along with Officer Joseph Andreani and other members of the New York City DEP Police, initiated what would become a protracted and complex campaign to remove themselves from SEIU. At that time, Plaintiff and his fellow officers set into motion a lengthy and arduous process by which the DEP Police Department would establish a union of their own under another charter. This movement to decertify was the result of SEIU's complete and utter failure to secure benefits for its members on par with that of counterpart CITY OF NEW YORK law enforcement employees, SEIU's unmitigated inability to resolve numerous specific contractual concerns, as well as SEIU's neglect in adequately addressing the needs of the DEP Police Officers.

23. Plaintiff SEMORILE, along with Officer Andreani, exercised his First Amendment rights by being a candid and forthright vocal advocate of the movement to decertify the

DEP Police Department from SEIU. Plaintiff SEMORILE played a principal and vital part in gathering the many signatures necessary to submit the decertification Petition. (A petition for decertification must be accompanied by signatures of at least fifty percent (50%) plus one (1) members in order to receive the consideration of the Board of Collective Bargaining). Furthermore, in June 2003, when the decertification Petition was first filed, Plaintiff SEMORILE signed the supporting Affidavit filed in Court, thereby taking on the role of representative of the group of officers who wished to decertify.

24.   SEIU was represented by their retained legal counsel, Mirkin & Gordon, P.C., with regard to the decertification matter. Mirkin & Gordon, P.C., were also retained by SEIU to represent members of SEIU, including personnel of the NYC DEP Police Department, with regard to disciplinary matters.

25.   Prior to the retaliatory events that transpired as outlined below, defendants, CITY OF NEW YORK, WELCH and  MILAZZO, along with SEIU, its President, James Golden, and Mirkin & Gordon, P.C., had full knowledge of plaintiff's vigorously active vocal participation in the decertification process. DEP Police Sergeant Thomas Powell, a  member  of  the  SEIU  board,  filed  a  NYC  Office  of

Collective Bargaining improper practice statement against SEIU, affirming that President Golden made the following statements at an SEIU board meeting: "who is this [Jose Semorile]?" "we are going to sue him civilly," "the lawyers and the international" will take care of that. Sgt. Powell further remarked that plaintiff SEMORILE's name was mentioned twice at said meeting, and statements were made to the effect that some form of action would be taken against him and any other SEIU member who signed the petition. Sgt. Powell thereafter resigned his position as SEIU board member, also stating that SEIU President Golden made the following comment concerning DEP Police Officers: They "are not cops," "all [they] do is watch fucking water." It must be noted that President Golden thereafter fired all DEP Police union delegates from their positions. SEIU delegates from DEP Police are appointed to their positions by the Union president.

26. It was common knowledge among all DEP police officers that Defendant MILAZZO and President Golden were close personal friends. Defendant MILAZZO, with the assistance of President Golden, achieved his status as Captain with the DEP.

27. In September 2003, plaintiff SEMORILE signed another Affidavit as representative of the petitioners in

the decertification process.

28.   The filing in June 2003 of the aforementioned Petition set in motion an extensive decertification process that would take over two years to conclude. After filing in June 2003, the Petition was thereby placed before the Board of Collective Bargaining for investigation, arguments and eventual determination of whether an election by all SEIU members was warranted. Throughout this process, Plaintiff SEMORILE exercised his first amendment rights by playing a vocal role in supporting decertification and actively campaigning for potential votes.

29.   Beginning in and around January, 2004, and continuing through November, 2004, a total of five hearings were conducted by the Board of Collective Bargaining in connection with the Petition for Decertification. Plaintiff, SEMORILE, was subpoenaed to appear at all five hearings.

30.   Pursuant to the NYC Administrative Code, Plaintiff was supposed to be let go by his employing agency to attend the hearings on City time.   Defendant WELCH denied Plaintiff's request to attend two of the five hearings and forced Plaintiff to use annual leave time. Plaintiff was advised by his immediate Supervisor, Sgt. Anthony Farina, that Defendant WELCH stated, "the subpoena

is not worth the paper it is written on."

31. After numerous hearings were conducted, and all of the briefs were submitted in support and in opposition to the Petition, a final hearing was held before the Board of Collective Bargaining in November 2004, *one month prior to the events forming the crux of this complaint.* At said hearing, the Board arrived its formal determination: a sufficient basis existed to order an election of SEIU members on the issue of decertification.

32. On December 27, 2004, plaintiff SEMORILE stopped by a roadside-vending stand located on the corner of Bainbridge Avenue and E. Gun Hill Road in the Bronx, near his residence. For over a year, plaintiff SEMORILE bought food and coffee in the morning from the vending stand's owner and operator, a 48-year-old Peruvian woman named Alicia Fernandez, authorized vendor No. 23501.

33. During the last week of December 2005, plaintiff SEMORILE had been plagued with flu-like symptoms, for which he took various over-the-counter remedies.

34. On December 27, 2004, plaintiff SEMORILE told Ms. Fernandez that he was feeling ill, and he asked her for some tea instead of his usual cup of coffee. Ms. Fernandez sold plaintiff tea in a paper cup covered with a plastic top.

35.   On the morning of December 29, 2004, Lt. Robert Flynn ordered plaintiff SEMORILE, along with his partner and fellow primary decertification advocate Officer Joseph Andreani, to appear at NYPD Medical Division for a "random" drug screening. At the time, plaintiff SEMORILE was working as a Detective with the Joint Terrorist Task Force, a combined federal and state level commission with the NYPD and other police agencies. Plaintiff SEMORILE and Detective Andreani were the only two NYC DEP detectives on duty that day to be ordered to take a "random" drug test. It should also be noted that Detective Andreani had testified in favor of decertification at the Collective Bargaining hearings and was an SEIU delegate who had been fired from his position as delegate in retaliation for speaking out.

36.   When plaintiff SEMORILE and Officer Andreani arrived at DEP offices located at 59-17 Junction Blvd., Flushing, New York, for "random drug screening" on December 29, 2004, plaintiff observed a black Crown Victoria bearing New York license plate number BWE 3659.  Said vehicle was assigned by DEP Fleet Services to defendant Captain Frank Milazzo at DEP headquarters located at 71 Smith Street Kingston, New York, in Ulster County. Defendant Milazzo's offices were located at DEP headquarters in Kingston. Defendant Milazzo is a resident of Ulster County.

37. Upon information and belief, defendant Milazzo ordered the "random" drug test of plaintiff and Detective Andreani on December 29, 2004, and delivered the order calling for the test to DEP offices located in Flushing, New York.

38. Prior to the test, Plaintiff SEMORILE was asked to fill out a Drug Screening Questionnaire. The first question on the questionnaire directed plaintiff to "List types of alcoholic beverages, mixers, tea, coffee ingested in the past 72 hours (3 days)," to which Plaintiff wrote that he had "beer, tea, coffee."

39. Sgt. Kloos of the NYPD Medical Unit performed the random drug test. Upon information and belief, Sgt. Kloos violated several procedures and regulations governing the procedures for random drug tests, including but not limited to, failing to seal the urine specimens in the presence of plaintiff and failing to secure chain of custody. After the test was completed, plaintiff returned to DEP offices in Sutton Park to continue his tour.

40. On the morning of January 13, 2005 at approximately 11:00 o'clock, plaintiff SEMORILE received a telephone call from Sgt. Anthony Farina ordering him, as per Chief Edward Welch, to immediately report to Sutton Park for a meeting. Plaintiff arrived at Sutton Park at

approximately 12:45 in the afternoon, where he met Lt.
Flynn and Sgt. Farina. They proceeded into Sgt. Farina's
office at which time Lt. Flynn requested Plaintiff hand
over his gun. Plaintiff was then informed that his drug
screening test results had come back positive for cocaine,
and he was served with a Notice and Statement of Charges.
Plaintiff was also given a "Patrol Guide procedure" stating
that NYPD utilizes DEP's personnel database to select
officer's names for "random drug testing." It must be noted
that plaintiff was not provided with a copy of said
"procedure" upon being hired and issued a "Patrol Guide" in
December 2001. Plaintiff was then accompanied to his home
where he handed over his department-issued Ruger P94,
handcuffs, Detective shield, and DEP and FBI identification
cards.

   41.   At no time was Plaintiff SEMORILE given or shown
a copy of the drug test results.

   42.   Defendant CITY proffered a charge of misconduct
pursuant to an alleged violation of Rule E.11 of the
Uniform Code of Discipline against plaintiff SEMORILE. Upon
information and belief, plaintiff was not subject to the
Uniform Code of Discipline at the time since Command
Disciplines were not a negotiated item covered under the
Collective Bargaining Agreement.

43.   Plaintiff SEMORILE emphatically maintains that he does not and has not abused cocaine or any other controlled substance, and further maintains his innocence of the proffered charge and specifications.

44.   On that same day, January 13, 2005, plaintiff SEMORILE had his urine tested by a private doctor at Bayside Laboratories, Inc. The test came back negative for all controlled substances.

45.   As a member of the United States Naval Reserves, plaintiff SEMORILE is subject to frequent random urinalysis testing. Plaintiff was tested on January 22, 2005 and October 17, 2004. Plaintiff SEMORILE has never tested positive for drugs. It must also be noted that plaintiff SEMORILE has an impeccable record with the US Naval reserves, and was recently promoted to Sergeant.

46.   On the morning of January 14, 2005, plaintiff SEMORILE spoke with Alicia Fernandez, the licensed vendor and owner of the breakfast cart located on Bainbridge Ave., from whom plaintiff had purchased the cup of tea on December 27, 2004. Plaintiff asked Ms. Fernandez what type of tea she had sold to him. Ms. Fernandez informed plaintiff that the tea was made by a company named Delisse, that the tea was called Cocalyptuss, and that the tea was manufactured in her native country of Peru.

47.   Plaintiff SEMORILE thereafter researched the tea he had ingested on December 27, 2004, two days prior to the random drug test that resulted in a false positive finding.

48.   Delisse Cocalyptuss Tea is made from coca leaves, eucalyptus and mint. The packaging of this tea reads: "traditionally used in the treatment of cold, flu and other mild affection to the respiratory system." Delisse Cocalyptuss Tea is manufactured by Enaco S.A. in Lima, Peru. The consumption of coca tea is a common occurrence in many South American countries.

49.   Plaintiff SEMORILE's consumption of Delisse Cocalyptuss Tea resulted in his unknowing ingestion of a product that resulted in his low level testing of positive for cocaine, a drug that is extracted from the leaves of the South American coca plant.

50.   The ingestion of the above tea and its direct link to false positive urine tests for cocaine has been the subject of numerous newspaper articles of recent date involving other City employees.  In other cases, said City employees have been reinstated to their positions of employments.  As recently as July 2005, a New York City Corrections Officer was restored to his position of employment after consumption of a Peruvian green tea resulted in a false-positive drug test.

51. On January 13, 2005, plaintiff SEMORILE was further advised by defendant CITY that an "informal conference" was to be held at the Office of Disciplinary Counsel on a date to be determined.

52. On January 18, 2005, plaintiff SEMORILE was officially suspended for thirty days without pay.

53. In January 2005, due to his financial inability to obtain private legal counsel, plaintiff SEMORILE was forced to accept legal representation from SEIU, *the same Union that he was a proponent of decertifying from*. An attorney from Mirkin & Gordon, P.C. was assigned to defend plaintiff.

54. At the time, plaintiff SEMORILE explained to SEIU that he was not comfortable with this arrangement since there was obvious and apparent animosity between him and the union representation. Plaintiff requested that the union provide him with different counsel or, approve legal expenses for independent outside counsel, in order to eliminate any potential conflict of interest. Plaintiff was told that the union would not provide different representation, that plaintiff had to be represented by Mirkin & Gordon, P.C., and SEIU further assured plaintiff that he would be fairly represented. Joel Spivak, Esq. of Mirkin & Gordon, P.C. was assigned to represent plaintiff

throughout the disciplinary process.

55.  On January 20, 2005, plaintiff SEMORILE wrote a letter to Marsha Rotheim in the Department of Environmental Protection - Office of the Disciplinary Counsel, requesting that his urine sample be retested. Defendant CITY **refused** to retest plaintiff's urine.

56.  On January 26, 2005, plaintiff SEMORILE wrote a letter to President Golden of SEIU informing him that he would not accept defendant CITY's offer to resign from the New York City Department of Environmental Protection. Plaintiff further advised President Golden that it was his desire to proceed with contesting the charge against him based upon plaintiff's ingestion of the tea and the resultant false positive test. A copy of said letter was also sent to Joel Spivak, Esq. of Mirkin & Gordon, P.C.

57.  On January 27, 2005, plaintiff SEMORILE received a "Notice of Informal Conference" from the Department of Environmental Protection, informing him that the "informal conference" was to be held on February 1, 2005 at 10:30 a.m.

58.  At said conference, plaintiff SEMORILE explained the connection between the ingestion of tea less than forty-eight hours prior to the random drugs test and the false positive results. Plaintiff again requested that his

urine sample be retested and offered all information to defendants concerning the vendor who sold plaintiff the tea. Defendants again refused to retest plaintiff's urine sample.

59. On February 1, 2005, immediately following the hearing, plaintiff SEMORILE received a "Notice of Determination after Informal Conference (Charges Upheld)" by the Department of Environmental Protection, stating that the penalty of termination was recommended. Upon information and belief, the Informal Conference was a sham as defendants had already conspired to secure plaintiff's termination from employment.

60. The City defendants, SEIU and their attorneys, Mirkin & Gordon, continued to pressure plaintiff SEMORILE into accepting defendant CITY's offer to resign. Determined to fight the test results and prove he had not in fact used cocaine, plaintiff once again informed the City defendants, SEIU, and the law firm they provided, Mirkin & Gordon, P.C., that he would not accept the Department of Environmental Protection's offer for his resignation in exchange for all charges being dropped.

61. On February 16, 2005, **one day** prior to the scheduled Formal Hearing, plaintiff SEMORILE received a letter from Joel Spivak, Esq. of Mirkin & Gordon, P.C., his

union representative, stating that he would "try to establish the affirmative defense of unknown ingestion of the tea which resulted in the positive test for cocaine." In addition, the letter stated that "to increase the likelihood of establishing the defense, it will be necessary, *inter alia*, to obtain the testimony of the woman who sold you the tea, for the tea to be tested and the test results confirm with expert testimony that the tea more than likely could have resulted in the positive test results."

62. The letter once again repeated defendant City's offer, which plaintiff SEMORILE had adamantly turned down previously on at least two occasions. The letter falsely stated that plaintiff had been advised of the conflict of interest and chose to have Mirkin & Gordon, P.C. represent him in this matter, when in fact, plaintiff had requested, on his own accord, that SEIU provide other legal counsel or approve legal expenses for outside counsel, SEIU denied plaintiff's request, and left plaintiff no alternative but to have Mirkin & Gordon, P.C. represent him since he could not afford private counsel and would not appear without legal representation given the seriousness of the charge and the penalty sought.

63. Mirkin & Gordon's conflict of interest was

unwaivable by plaintiff and known to the City defendants

64. At the Formal Hearing on February 17, 2005, Joel Spivak, Esq. of Mirkin & Gordon, plaintiff's union representative, failed to offer a single shred of evidence on plaintiff's behalf to establish the affirmative defense outlined in his letter of the previous day. Mr. Spivak, the union's representative, never spoke to Ms. Fernandez, never had the tea tested, never asked that plaintiff's urine be retested, and never obtained expert testimony.

65. Additionally, the Sergeant who had administered the "random" drug test to plaintiff SEMORILE was mysteriously absent from the hearing on February 17, 2005, and defendant CITY never offered any evidence to prove the charge against plaintiff.

66. Mirkin & Gordon, in conspiracy with defendants, failed to submit evidence that plaintiff SEMORILE was in fact sick during the last week of December 2004; that plaintiff did in fact speak with Ms. Fernandez about his flu-like ailments and that Ms. Fernandez, unbeknownst to plaintiff, sold plaintiff a cup of tea made from extracts of the leaves of a coca plant; that although coca tea is illegal in the United States due to its cocaine content, it is easily obtainable over the internet; that coca tea is advertised as a remedy for flu-like sickness; that Ms.

Fernandez admits that she sold plaintiff coca tea; that Ms.
Fernandez is from Peru where coca tea is manufactured and
ingested regularly; that plaintiff unknowingly ingested the
tea; that scientific studies have shown that a person can
test positive for cocaine metabolites after drinking the
tea ingested by plaintiff; that the low-level amount of
cocaine metabolites present in Plaintiff's urine sample is
consistent with drinking a cup of coca tea; that similar
factual circumstances have occurred throughout this country
and that several individuals who tested positive for
cocaine use after ingesting coca tea had regained their
jobs and were vindicated of any wrongdoing; or that
plaintiff is a member of the United States Army reserves
and as such undergoes random urinalysis testing and has
never tested positive.

67. Defendant CITY failed to honor plaintiff's
request that the urinalysis specimen be retested by a
different laboratory.

68. Mirkin & Gordon, in conspiracy with defendants,
failed to challenge the chain of custody of the urinalysis
sample.

69. Mirkin & Gordon, in conspiracy with defendants,
failed to object to the fact that the person who
administered the urinalysis test was not present at the

hearing.

70.   Mirkin & Gordon, in conspiracy with defendants,
failed to recommend plaintiff SEMORILE give a hair sample,
a much more accurate and telling test since it can show a
subject's extended history, or lack thereof, of drug use.

71.   Defendant CITY failed to have the contents of the
tea plaintiff ingested analyzed in a laboratory, despite
plaintiff's request.

72.   On February 17, 2005, the day of the hearing, Mr.
Spivak, in collusion with defendants, repeatedly advised
plaintiff that taking the CITY's offer of resignation was
in his best interests. Mr. Spivak warned plaintiff that
there might be undue media exposure of his family, that he
would never have a job in law enforcement again, and that
if he took the offer he would most likely have another city
job in two to three months.

73.   Based upon the pressures placed upon plaintiff
SEMORILE by defendants and the union representation, the
fact that plaintiff's attorney did not have any evidence in
his defense at the hearing, the fact that plaintiff was
advised that an adjournment could not be had, as well as
the biased and conspired advice and counsel he was given,
plaintiff was coerced into signing a letter of resignation
effective July 8, 2005, ending his employment with

defendant CITY OF NEW YORK as an environmental police officer in the DEP.

74. Plaintiff unwillingly signed the resignation under extreme duress and coercion, having been convinced by his legal, and conflicted, representative from SEIU that he had no other alternative. Said resignation was extracted after defendants conspired to secure the termination of plaintiff's employment in retaliation for plaintiff's open verbal advocacy of the decertification movement.

75. Upon information and belief, Mirkin & Gordon agreed with CITY defendants not to present evidence at plaintiff's hearing, thereby forcing plaintiff to sign the resignation agreement.

76. Plaintiff SEMORILE made it known to defendants on several occasions prior to the hearing that it was his desire to fight the charges against him and to show that he had not used cocaine.

77. Plaintiff SEMORILE made it abundantly clear to defendants on several occasions prior to the hearing that it was not his desire to sign a resignation agreement.

78. Defendants failed to apprise plaintiff SEMORILE of the possible alternatives to signing the resignation agreement.

79. Mirkin & Gordon, in conspiracy with defendants,

failed to counsel plaintiff SEMORILE on the ramifications of signing the resignation agreement.

80. Defendants pressured plaintiff SEMORILE into signing the resignation agreement by in effect telling him he had no other options.

81. On February 24, 2005, plaintiff SEMORILE received a letter from Marsha Rotheim in the Department of Environmental Protection - Office of the Disciplinary Counsel, stating that the charges pending against him had been withdrawn in accordance with the tendering of his resignation effective on July 8, 2005.

82. Defendants conspired to deny plaintiff SEMORILE of his due process rights as guaranteed by the Fourteenth Amendment of the Constitution and further provided for under Civil Service Law Section 75 and the Collective Bargaining Agreement.

83. Defendants conspired to terminate plaintiff's employment in retaliation for plaintiff's active participation in speaking out against defendant union and promoting decertification and further exercising plaintiff's First Amendment rights.

84. The aforementioned willful and malicious retaliatory actions of the defendants taken against plaintiff for exercising his constitutional and civil

rights were followed closely in time after plaintiff's constitutionally protected activity of heading the lobby for decertification, more specifically, said retaliatory acts occurred one month following the Board of Collective Bargaining's determination in favor of a decertification election.

85. On or about August 2005, one hundred percent of the SEIU DEP members voting in the election, voted to 1) decertify DEP Police Department from SEIU and, 2) voted the Executive Board members of SEIU, Local 300, including President Golden, out of office.

86. On or about October 2005, DEP Police Department was officially decertified from SEIU, Local 300 by the Board of Collective Bargaining.

**AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION
AGAINST DEFENDANTS FOR FIRST AMENDMENT RETALIATION**

87. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through X, inclusive.

88. Plaintiff was unlawfully suspended and terminated in retaliation for exercising his First Amendment rights to free speech and free association.

89. The aforementioned conduct on the part of the defendants was without cause or justification and violated

plaintiff's rights, civil rights, privileges and immunities as guaranteed by the First Amendment of the United States Constitution, as well as the Constitution of the State of New York.

90.  The actions of the defendants in depriving plaintiff of his constitutional and civil rights were willful and malicious.

91.  As a direct and proximate consequence of defendants= unlawful termination of plaintiff's employment, plaintiff has suffered losses of employment benefits and privileges, been damaged professionally and economically, as well as suffering physical and emotional pain and suffering.

92. Based on the forgoing, plaintiff is entitled to compensatory damages in the amount of ONE MILLION ($1,000,000.00) DOLLARS, and punitive and exemplary damages in the amount of FIVE MILLION ($5,000,000.00) DOLLARS.

WHEREFORE, plaintiff requests that this court:

1.  Determine that defendant CITY discharged plaintiff without just cause, in retaliation for and in violation of plaintiff's First Amendment rights;

2.  Award plaintiff damages in the sum of One Million Dollars for each cause of action;

3.  Order that defendant CITY reinstate plaintiff in

the job previously held, retroactive to the date of plaintiff's discharge, and without any breach in plaintiff's seniority; and

4.   Grant plaintiff such other and further relief as this Court deems just and proper.

Dated:   Lake Success, NY
         January 19, 2006

                    Yours, etc.

                    Cronin & Byczek, LLP
                    Attorneys for Plaintiff

          By:   *Christina A. Leonard*
                _____
                CHRISTINA A. LEONARD  (CL 5020)
                1981 Marcus Avenue
                Suite 227
                Lake Success, New York 11042
                (516) 358-1700

STATE OF NEW YORK )
                  :  ss.:
COUNTY OF NASSAU  )

      ROSE HORAN, being duly sworn says, I am not a party to the action, am over 18 years of age and reside in the County of Nassau, State of New York.

      On January 20, 2006, I served a true copy of the within SECOND AMENDED COMPLAINT AND JURY DEMAND by mailing the same in a sealed envelope, with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee as indicated below:

New York City Law Department
Labor & Employment Law Division
100 Church Street
New York, New York   10007
Attn:  Rippi Gill
     Assistant Corporation Counsel

                                     _____

                                      ROSE HORAN

Sworn to before me this
20th day of January, 2006

_____
   Notary Public

               ROCCO AVALLONE
        Notary Public, State of New York
            No. 02AV4981892
         Qualified in Suffolk County
      Commission Expires May 20, 20 07

05-CV-7261

*Index No.*                    *Year 20*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE SEMORILE, JR.,

                                                Plaintiff,

        - against -

CITY OF NEW YORK et al.

                                             Defendants.

## SECOND AMENDED COMPLAINT AND JURY DEMAND

### CRONIN & BYCZEK, LLP
ATTORNEYS AT LAW
1981 MARCUS AVENUE, SUITE 227
LAKE SUCCESS, NEW YORK 11042-1016
(516) 358-1700

*To:*

*Attorney(s) for*

*Service of a copy of the within*                                      *is hereby admitted.*

*Dated:*

..................................................................

                                *Attorney(s) for*

## PLEASE TAKE NOTICE

☐  *that the within is a (certified) true copy of a*
NOTICE OF  *entered in the office of the clerk of the within named Court on*           *20*
ENTRY

☐  *that an Order of which the within is a true copy will be presented for settlement to the Hon.*
NOTICE OF          *one of the judges of the within named Court,*
SETTLEMENT  *at*
         *on*                   *20*     , *at*          *M.*

*Dated:*

                                        ### CRONIN & BYCZEK, LLP
                                        ATTORNEYS AT LAW
                                        1981 MARCUS AVENUE, SUITE 227
                                        LAKE SUCCESS, NEW YORK 11042-1016